Argued September 21, reversed October 3, modified on rehearing November 27, 1917.

## GATES *v.* PUBLIC SERVICE COMMISSION.

(167 Pac. 791; 168 Pac. 939.)

**Waters and Watercourses—Water Supply—"Public Utility"—Ownership—Municipality—"Owner."**

1.   Under its charter authorizing a city to construct or purchase waterworks and reservoirs, or to grant to any person or corporation a franchise or permission for the construction of waterworks, including the right to use the streets, etc., the city council passed an ordinance providing that plaintiff should construct and maintain a water plant in consideration of a payment of $12,000 by the city and a lease of the plant for 20 years. The ordinance required the city to acquire land for a reservoir site and right of way thereto, as well as rights of way for all water-mains, and allowed plaintiff during the 20-year period to charge fixed water rates. Sections 715, 716, L. O. L., declare that in construing a statute effect should be given to all of its terms, and that the intention of the legislature should be pursued, if possible. Laws of 1911, Chapter 279, page 483, Section 6, confer on the Public Service Commission authority to regulate every public utility, which Section 1 defines as embracing all corporations, individuals and associations that own, operate or manage any plant for furnishing water, etc., but declares that no plant owned or operated by a municipality shall be deemed a public utility. *Held*, that the water plant was owned by the city, which had dominion over it, as title to the reservoir and rights of way was taken in the name of the city, the mains were located in the streets which by the charter were declared to

belong to the city in fee, and hence the Public Utility Commission had no jurisdiction to supervise the rates.

[As to review by Public Service Commission of municipal regulation of public service corporation, see note in **Ann. Cas. 1916E,** 1083.]

### ON PETITION FOR REHEARING.

**Municipal Corporations—Contracts—Construction.**

2. The construction of contracts to which a municipality is a party is governed by the same rules applying to contracts between natural persons.

**Waters and Watercourses—Rates and Charges—Regulation.**

3. Under Public Utilities Act (Gen. Laws 1911, c. 279, p. 483), providing that no plant owned or operated by a municipality shall be deemed a public utility thereunder, the Public Service Commission cannot regulate water rates where the water system is owned by the city, though operated by lessees.

**Constitutional Law—Judicial Functions—Encroachment on Legislature.**

4. Whether it is good or bad policy to exclude water systems owned by cities and operated by lessees from the operation of the Public Utilities Act is not a matter for the courts.

**Public Service Commissions—Actions to Set Aside Findings—Exclusiveness of Remedy.**

5. Under Public Utilities Act (Gen. Laws 1911, c. 279, p. 279, § 54), providing that a party deeming himself aggrieved by an order of the Public Service Commission may commence a suit in the Circuit Court against the commission as defendant to set aside its findings, the remedy prescribed by statute is exclusive.

**Waters and Watercourses—Regulation of Rates—Suits—Parties.**

6. In a suit by a lessee of a water system owned by a city under Public Utilities Act (Laws 1911, c. 279, p. 483, § 54), to set aside an order of the Public Service Commission, reducing the rates to be charged for water, the city was improperly joined as a defendant.

From Polk: PERCY R. KELLY, Judge.

Suit by H. V. Gates against the Public Service Commission of Oregon (formerly the Railroad Commission) and the City of Dallas, a municipal corporation, of Polk County, Oregon, in which the plaintiff has appealed from an order of the Public Service Commission of Oregon, rates charged for water furnished the citizens of Dallas. Reversed and decree entered.

In Banc.    Statement by Mr. Justice Bean.

This is a suit to set aside the order of the Public Service Commission reducing the rates to be charged the inhabitants of the City of Dallas by the plaintiff for furnishing water.    The trial court dismissed the suit and plaintiff appeals.

On September 17, 1902, the council of the City of Dallas passed Ordinance No. 23, entitled:

"An Ordinance providing for the supplying of the City of Dallas, Oregon, and its inhabitants with water for public and private use, and contracting with H. V. Gates, his successors and assigns, to construct a water plant for the City of Dallas, and providing for the payment of Twelve Thousand ($12,000) dollars and a lease of said plant to H. V. Gates, his successors or assigns, for a period of twenty (20) years or until termination by agreement of the contracting parties as payment for said water plant."

Section 6 of the ordinance provides, in substance, that the contractor shall construct a masonry reservoir of not less than three hundred thousand (300,000) gallons capacity, to be supplied with supply and waste-pipes, furnish and lay at a depth of not less than twenty-four (24) inches below the grade of the streets and along the right of way from the reservoir and in the city, a specified number of feet of the different sizes and kinds of pipe, and furnish, lay, set up and connect with this system of pipes a certain number of hydrants.

Section 7 is as follows:

"The city shall secure the following lands and rights free of cost to the contractor, said land rights to be used only for the waterworks plant.

"First.    Sufficient ground for reservoir site and the right of way thereto and therefrom.

"Second.    The right of way for all water-mains.

"Third. The right to use the waters of Canyon Creek or other supply and the right of way therefrom to the reservoir."

Section 8 reads:

"In consideration for the benefits which will be derived by the City of Dallas and its inhabitants from the construction of said water plant, the city shall pay to the contractor twelve thousand ($12,000) dollars, lawful money of the United States, as follows: First payment of six thousand ($6,000) dollars on arrival of all pipe and material for water plant, said pipe and material shall have a value of not less than ten thousand ($10,000) dollars and be owned by the contractor; said first payment shall constitute a lien upon said pipe and material; second payment of six thousand ($6,000) dollars to be made on completion of the plant and when test of same has been satisfactorily made as per conditions hereinafter stated, and the contractor has shown that the plant is free from all debts, liens and encumbrances, and is of sufficient value, as shown by the cost of the same, to amply protect the city in the payment of said sums to the contractor, and has cost the contractor not less than $20,000.00 exclusive of rights and lands to be furnished by the city, as provided in Section 7 of this ordinance. After all said payments are made, the material and plant shall be and remain the property of the city, and shall not be removed therefrom. And as a further consideration, on such test and payments as above stated being made, and dating therefrom, the contractor shall retain as lessee the use of said plant for a period of twenty (20) years thereafter or for such further time as hereinafter provided, paying for such an annual rental of one dollar ($1); such use and lessee to be governed by the following conditions:

"First. The contractor is to keep said plant in good repair, add to it such machinery, mains, pipes, supplies of material, increase of water supply, and to make extensions of mains as may from time to time become necessary to supply the city and its inhabitants with water. The contractor is to furnish free of cost

to the city, water supply for all hydrants in addition to those provided for in Section 6 of this ordinance, but such additional hydrants shall be supplied, and mains thereto shall be laid, in case mains thereto are not already laid, by the city at its own cost.

"Second. The contractor is to keep the reservoir supplied with water so that all users of water will have an ample supply at all times; except, at such times through unavoidable causes when the conduits fail, mains be shut off for repairs or renewals, in which or either event the repairs shall be speedily made and work done.

"Third. The contractor is to keep the fire hydrants in good repair; protect them from the effects of frost, and keep them ready at all times for instant service. The connections leading from reservoir to mains shall be kept free from all obstructions of any kind, so that unless through some unforeseen and practically unavoidable cause, there shall be a full supply of water on the fire hydrants, so that during times of fires there can be used at any time the same number of fire streams of like force and pressure as provided for in the test of Section 13 herein.

"Fourth. The contractor shall furnish water to the fire hydrants for the extinguishment of fires and for drill practice and flushing sewers, and for the City Hall, free of cost to the city. In the aforesaid drill practice, the fire department shall have the right to use any hydrant at any time at reasonable hours. The flushing of sewers to be conducted through a hose and nozzle, but there shall be no more than one hydrant used at any one time for such purpose, and its use must be reasonable and economical.

"Fifth. The contractor shall make such rules and regulations governing the service of water to private consumers as may be proper and expedient in that behalf; such rules and regulations to be such as are in use in other water plants of Oregon subject to the approval of the council; and may enforce their observance by cutting off water or otherwise, and this city shall pass ordinances protecting the contractor in the safe and unmolested enjoyment of the privileges herein

granted and against injury to the property in charge of the contractor.

"Sixth.   The contractor may charge and collect during the continuance of the leasing of said water plant the following tariff of rates to consumers of water, or other rates that may be established by the contractor and approved by the city."

Here follows a schedule of water rates to be charged.

Section 10 provides that:

"At the expiration of twenty (20) years from the date of the passage of this ordinance, or at the end of each succeeding period of five (5) years thereafter, optional with the city, the value of the water plant at that time shall be determined by the parties hereto, but if they cannot agree they shall determine its value by arbitration. * * In determining or ascertaining the value of said water plant, whether by arbitration or otherwise, there shall not be considered or included any of the property acquired by the city under the provisions of Section 7 of this ordinance, or any improvement made by the city after the test of said waterworks plant and its acceptance by the city.   When such value is thus found, the amount so found, less the twelve thousand ($12,000) dollars already paid as herein provided for, shall be paid to the contractor, as a final consideration for additions, extensions and repairs made during the construction of the plant and the use of the same by the contractor.   Until such arbitrament is made and the amount determined paid over to the contractor, the use and lease of the plant shall be extended and continued unmolested according to the provisions hereinbefore made and provided."

After providing for the acceptance of the ordinance by the contractor, Section 14 proceeds:

"Said acceptance shall constitute the contract and shall be the measure of rights and liabilities of the City of Dallas and the contractor, but nothing in said acceptance shall vary the terms of this contract or

enlarge or diminish the rights or liabilities of either parties hereto."

This ordinance was accepted by Gates on May 28, 1903. Attached to it appear two receipts for money paid by the City of Dallas for the cost of extending water-mains and which are to be a credit when a settlement is made at the expiration of the lease. Under the terms of the contract the plaintiff constructed the plant. It was completed and accepted about April 1, 1904. The city paid the plaintiff the sum of $12,000 for the system and after acceptance of the same the plaintiff entered into possession thereof as provided in the ordinance, and has ever since continued to operate the plant, and has charged and collected the sums specified in the ordinance for the use of the water. It appears that on March 1, 1909, an agreement was made between the city and Gates as lessee reducing the rates. On September 27, 1913, the city made a complaint against the plaintiff before the Railroad Commission of Oregon (now the Public Service Commission), alleging that the plaintiff was a public utility; and that the rates charged were unjust, unreasonable, and excessive. The plaintiff answered, denying that the rates were unjust, unreasonable or excessive, or that he was a public utility, alleged that the plant and equipment for furnishing water was owned by the City of Dallas, and challenged the jurisdiction of the commission. On November 4, 1914, the commission found in favor of the city on both grounds.

                    Reversed and Decree Entered.


For appellant there was a brief over the names of *Mr. Oscar Hayter* and *Messrs. Huston & Huston,* with oral arguments by *Mr. Samuel B. Huston* and *Mr. Hayter.*

For respondent, the Public Service Commission, there was a brief over the names of *Mr. George M. Brown,* Attorney General, and *Mr. John O. Bailey,* Assistant Attorney General, with an oral argument by *Mr. Bailey.*

For respondent, City of Dallas, there was a brief and an oral argument by *Mr. Ed. F. Coad.*

MR. JUSTICE BEAN delivered the opinion of the court.

1. Section 27, subdivision 35, of the Charter of the City of Dallas, provides as follows:

"To provide the city with good and wholesome water for domestic, fire and power purposes; and for the erection, construction or purchase of such waterworks and reservoirs, within and without the limits of the city, as may be necessary or convenient therefor; and the cost of erection, construction or purchase of such waterworks shall be provided for in the manner prescribed in Section 51 of this act."

Subdivision 36 is as follows:

"To grant to any private person, or to any private corporation, a franchise or permission for the erection or construction of waterworks within the city and with all rights and powers pertinent thereto, including the right to use the streets and public ways for the purpose of laying pipes and other necessary appurtenances. Such franchise shall be used under such rules and regulations and restrictions, including the rate to be charged for such water, as the council may from time to time prescribe."

By Ordinance No. 33, page 34, Charter and Ordinances of Dallas, the city authorized the sale of bonds to the amount of $15,000 for the purpose of acquiring and constructing a system of waterworks for the city, of which the sum of $3,000 was expended for rights of way and $12,000 used in part payment to plaintiff.

The jurisdiction of the commission to supervise and regulate every public utility in this state is conferred by Section 6, Chapter 279, General Laws of Oregon for 1911, page 484. By Section 1 of that act the term "public utility" is defined as follows:

"The term 'public utility' as used herein, shall mean and embrace all corporations, companies, individuals, associations of individuals, their lessees, trustees or receivers (appointed by any court whatsoever), that now or hereafter may own, operate, manage or control, any plant or equipment or part of a plant or equipment in this state, * * for the production, transmission, delivery or furnishing of heat, light, water or power, and any and all whether either directly or indirectly to or for the public, and whether said plant or equipment or part thereof is wholly within any town or city, or not.

"No plant owned or operated by a municipality shall be deemed a public utility under or for the purposes of this act."

The question for determination, therefore, is: Who is the owner of the water plant within the meaning of the public utility act of 1911? If owned by the city then the commission has no authority to fix the rates, but if owned by Gates it has that authority. It appears from the record that all the deeds for the right of way were executed to the City of Dallas. The title of the ordinance and the provisions thereof clearly indicate that the city is the owner of the plant. The payment of $12,000 and all tolls that might be collected by Gates during the twenty years mentioned, or such further time as the same might be extended, was the consideration to be paid by the city for the construction, extension, repair, and management of the plant.

Section 715, L. O. L., declares the general rule of construction of statutes thus:

"In the construction of a statute or instrument, the office of the judge is simply to ascertain and declare what is, in terms or in substance, contained therein, not to insert what has been omitted, or to omit what has been inserted; and where there are several provisions or particulars, such construction is, if possible, to be adopted as will give effect to all."

Section 716, L. O. L., reads in part as follows:

"In the construction of a statute the intention of the legislature, * * is to be pursued, if possible. * *

In *Helm* v. *Gilroy*, 20 Or. 517, 522 (26 Pac. 851), the court said:

"The true criterion of an irremovable fixture consists in the united application of several tests: (1) Real or constructive annexation of the article in question to the realty. (2) Appropriation or adaptation to the use or purpose of that part of the realty with which it is connected. (3) The intention of the party making the annexation, to make the article a permanent accession to the freehold, this intention being inferred from the nature of the article affixed, the relation and situation of the party making the annexation, the policy of the law in relation thereto, the structure and mode of the annexation and the purpose or use for which the annexation has been made."

See *Blanchard* v. *Eureka Planing Mill Co.,* 58 Or. 37 (113 Pac. 55, 37 L. R. A. (N. S.) 133); *Bay City Land Co.* v. *Craig,* 72 Or. 31, 44 (143 Pac. 911); *Johnson* v. *Pacific Land Co.,* 84 Or. 356 (164 Pac. 564); 11 R. C. L., p. 1059 et seq.

Section 60, Charter of the City of Dallas, 1901, provides as follows:

"The fee of all streets and alleys now within the City of Dallas is vested in the City of Dallas and shall forever remain open as thoroughfares for the use of the public unless legally closed by the city council."

It will be noticed that the contract between Gates and the city directs that "after all said payments are made, the material and plant shall be and remain the property of the city, and shall not be removed therefrom." In securing the water right and the right of way for the reservoir site and pipe-lines, etc., it was necessary for the city to bring condemnation proceedings. In one of these cases, *Dallas* v. *Hallock,* 44 Or. 246, 256 (75 Pac. 204), in determining whether or not the city had the right to condemn the right of way, this court, speaking through Mr. Justice Wolverton, used the following language:

"Whether the city intends leasing the plant when it has acquired it, or has not provided the ready funds with which to pay for its construction, cannot affect them in the least. The contract contemplates that the city shall own the system when completed, and the fact that the builder, as a part consideration for its construction, is to take as lessee the tolls for a term of years, cannot affect the right to construct, and for that purpose to acquire the easements necessary thereto."

"An owner is one who has dominion over that which is the subject of the ownership. He has the right to make such use of it, consistently with the rights of others, as he may see fit. The ownership may extend to the entire thing, or may be limited to an interest in it, and whatever is the subject of the ownership is held by the owner for his own individual benefit: *Flormam* v. *School Dist. No. 11,* 6 Colo. App. 319 (40 Pac. 469), 6 Wds. & Phrases, p. 5135."

We have, however, to consider who is the owner of the water plant within the meaning of the public utility act. The language of the latter part of the section defining a public utility says, "no plant owned or operated by a municipality shall be deemed a public utility under or for the purposes of this act." It seems to us that this clearly excludes the plant in question from

the jurisdiction of the Public Service Commission. The lawmakers evidently intended that where a municipality either owned or operated such a plant the city authorities should regulate the rates to be charged. This was done in the case under consideration by the passage of Ordinance No. 23, fixing the rates for water. The City of Dallas is the owner of the water plant in question within the meaning of the public utility act. The commission has only such authority as the lawmakers in their wisdom have seen fit to confer upon it.

Counsel for defendants cited and relied upon *Hunter* v. *City of Roseburg,* 80 Or. 588 (156 Pac. 267, 157 Pac. 1065). We see no analogy between that case and the present one. They urged that according to the terms of the ordinance and contract the city never agreed to purchase the plant from Gates. This might be answered by saying that the city would not be expected to make an agreement to purchase its own property. In its contract with Gates to construct the waterworks it was to pay a definite sum and in addition he was to have the proceeds derived from the plant until the city should pay an amount to be thereafter fixed. The decree of the trial court will be reversed and one entered here setting aside the order of the commission.

REVERSED AND DECREE RENDERED.

MODIFIED ON REHEARING.

MR. JUSTICE MCCAMANT took no part in the consideration of this case.

Modified on rehearing November 27, 1917.

ON PETITION FOR REHEARING.

(168 Pac. 939.)

From Polk: PERCY R. KELLY, Judge.

On petition for rehearing. Former opinion modified.

*Mr. George M. Brown,* Attorney General, and *Mr. John O. Bailey,* Assistant Attorney General, for the petition on behalf of the Public Service Commission of Oregon.

*Mr. Ed F. Coad,* for the petition on behalf of the City of Dallas.

*Messrs. Huston & Huston* and *Mr. Oscar Hayter,* opposing the rehearing in the interest of plaintiff-appellant.

In Banc.   Opinion by MR. CHIEF JUSTICE MCBRIDE.

The brief of the learned Attorney General seems to us to be merely a repetition of his arguments urged upon the hearing. The question in a nutshell is this: Who owns the Dallas water plant? If Gates owns it, the commission has a right to regulate the rate charged for water. If the city of Dallas owns it, the commission has no such right. The situation may be briefly stated thus:

In 1902 the City of Dallas, by virtue of a provision of its charter, was authorized to expend the sum of $25,000 for the construction of a water system. The amount being, in the judgment of the inhabitants, in-

sufficient to construct a plant capable of furnishing an adequate supply of water, the City of Dallas by its proper officials, entered into a contract with plaintiff to build for the city a water plant sufficient for the purposes contemplated. The title of the ordinance which constituted the contract, specified that the contractor was to "construct a water plant for the City of Dallas" and that he should be paid therefor the sum of "$12,000.00, and a lease of said plant for a period of twenty (20) years, or until termination by agreement of the contracting parties." The city was to secure rights of way for the conduits, reservoir site, and the right to use the waters of Canyon Creek, and the right of way therefrom to the reservoir. It was then provided when and under what conditions the $12,000 mentioned in the title to the act was to be paid. And further provided that after all of such payments are made, "the material and plant shall be and remain the property of the city and shall not be removed therefrom."

It was further provided that after the plant had passed certain tests and the payments had been made and dating therefrom, "the contractor (plaintiff) shall retain as lessee the use of said plant for a period of twenty years." It was also provided that at the expiration of twenty years, or at the end of each succeeding period of five years thereafter, the city at its option might cause a valuation to be placed upon the property, if the contracting parties should fail to agree, and the amount of such valuation should be paid to the contractor less the sum of $12,000 already paid by the city, but until such determination and payment the use and lease of the plant was to continue in the contractor upon the same terms as originally

agreed upon. The ordinance fixed in detail the rates which should be charged for water.

2. Plaintiff constructed the plant and there is no charge that he in any way failed to live up to the terms of his contract. The rules governing the construction of contracts, where a municipality is a party, do not differ in any way from those applying to contracts made between natural persons, and the same rules of morality that require a natural person to keep his contract, are applicable to a city. The contract provided that the plant should be built for the city; that the city should provide the right of way and reservoir site, and that plaintiff as contractor—not owner—should receive as compensation therefor the sum of $12,000 and a lease of the property and water plant, with the right to charge certain prescribed rates for a period of twenty years.

Under this contract plaintiff did not and does not now own a single rod of pipe or a single cubic foot of reservoir. By the words of the contract, the plant remains the property of the city and plaintiff's interest is that of a mere lessee. In condemning the right of way, the city appeared as a plaintiff claiming— under pleadings sworn to by its officers—that it required the property for its use, not plaintiff's use.

In the case of *Dallas* v. *Hallock,* 44 Or. 246, 256 (75 Pac. 204), cited in the original opinion, the very question at issue here was discussed. Justice WOLVERTON said:

"The contract contemplates that the city shall own the system when completed, and the fact that the builder as part consideration for its construction, is to take as lessee the tolls for a term of years, cannot affect the right to construct, and for that purpose to acquire the easement thereto."

Had the City of Dallas made the claim that is now made, that plaintiff was the owner, it would have gone out of court and its right to condemn would have been denied. We are not prepared to say in the face of the fact that the contract in substance declares the City of Dallas to be the owner and plaintiff a lessee—that Dallas is not the owner. Neither are we prepared to say that it can blow hot and cold in the same breath, by condemning Mrs. Hallock's and Judge Boise's property under a pretext of ownership, and in this action denying such ownership in order to lay a foundation for action by the Public Service Commission.

3. That the City of Dallas is the owner of the water system seems almost too plain to admit of argument, but on account of an alleged hardship entailed upon the city, if it shall be compelled to keep its contract, we are urged to construe the statute as meaning something different from what the terms used ordinarily imply. The contention of counsel for the city is this, quoting his own language:

"The provision relied on by appellant in exempting the city from the Act of 1911, is as follows: 'No plant owned or operated by a municipality shall be deemed a public utility under this act!' I feel confident that the character of ownership intended by the legislature in making this exception, was such ownership as carried with it the operation of the plant in distributing water to its inhabitants, as well as the ownership in fact."

Such is not the natural import of the language used, which makes the exception depend upon one or the other of two contingencies. (1) Where the city owns a water system, and (2) where it operates a water system owned by someone else. Construction is as a usual thing, only resorted to where the statute is ambiguous. Here it is clear. If it had been the inten-

tion of the legislature to include within the operation of the Public Utilities Act all utilities owned by a city but operated by lessees, it could easily have said so at the expense of one line of print. It is quite probable the legislature had in mind the doctrine that cities which had already contracted by lease with private persons for the operation of their utilities, should not be allowed to ask the Public Utilities Commission to modify their contracts, and that in the future municipalities which might make like contracts, would be capable of protecting themselves by proper reservations in the contracts.

To say that a city which, under the ordinary rules of construction of contracts would be the owner, is, for the purposes of this act not the owner, and that the lessee who under the ordinary course of construction would be held not an owner is, for the purposes of this act an owner, would be to amend the statute by the baldest judicial legislation.

4. The Attorney General indulges in dire forebodings as to what might happen in case we should hold that the statute means literally what it says. His point is that the method adopted in the *Dallas Case* may be adopted for the purpose of giving bonuses, but how it would have this tendency does not appear. Another suggestion is that the Dallas method may be resorted to for the purpose of avoiding the operation of the Public Utility Act. This objection may be urged with equal force against any law permitting cities to be incorporated or allowing them to own public utilities. If a city owns or operates a public utility, such utility is automatically relieved from the operation of the act. Whether this is good or bad policy is not a matter for the courts but for the legislature which has in its wis-

dom, or unwisdom, abstained from appointing a guardian for cities owning or operating public utilities.

The contract between the City of Dallas and plaintiff was not concocted by a set of grafting officials, conspiring in secret to give the plaintiff some advantage but the question of issuing bonds to carry out the contract was submitted to a vote of the people, who by withholding their approval could have defeated the whole project. That the contract has now become more or less profitable is no reason why the courts should go beyond the plain letter of the law to give the Public Utilities Commission jurisdiction to set it aside or modify it. We have been asked by counsel for the city to decide several other matters which are not involved in the question before us. Our decision upon such questions would have no legal validity and the contract seems too plain to require interpretation.

5, 6. One question, however, is raised upon the petition for rehearing which has been overlooked heretofore. It was stipulated that the City of Dallas should be at liberty at any time to raise the question that it was not a proper party defendant, and that question was raised in the lower court. This is a proceeding *sui generis.* Instead of providing for an appeal to the Circuit Court from the findings of the commission, Section 54 of Chapter 279, General Laws of 1911, provides that the party deeming himself aggrieved may commence a suit in the Circuit Court "against the commission as defendant" to set aside such findings. The proceedings are special and in many features differ from those of an ordinary suit in equity. We think the remedy prescribed by statute is exclusive and the City of Dallas was improperly joined. The suit will, therefore, be dismissed as to the City of Dallas and the city will recover of plaintiff its fees paid for filing

answer and for appearance in the Circuit Court, and the expense of printing its brief in this court, these appearing to be the only costs which it incurred which do not apply as well to the other defendant as to it. As to the other defendant, we adhere to our original opinion.

MODIFIED ON PETITION FOR REHEARING.